The Honorable, the Judges of the United States Court of Appeals for the Fourth Circuit. Oyez, oyez, oyez, all persons having any manner or form of business before the Honorable of the United States Court of Appeals for the Fourth Circuit are admonished to draw an eye and give their attention, for the Court is now sitting. God save the United States and this Honorable Court. Good morning. Please be seated. We are ready for oral argument in our first case. Mr. Dreehan? Yes, Your Honor. Members of the panel, may it please the Court. We are here today on a case that is about a conspiracy between a prime contractor, Serco, and a group of former L-3 employees who formed their own brand new company, Jackson, so that Serco might award them government contracts related to high-altitude electromagnetic pulse or HEMP testing over L-3, the appellant in this case. The District Court granted summary judgment to Serco on a number of counts, incorrectly dismissing all of L-3's claims. Given the number of issues in this case, we've briefed them all, and I'm happy to answer any questions that you have on any of them, but I'm going to focus on a few specific issues here today. In short, for all issues, we would respectfully submit that the District Court misconstrued fundamental precepts of Virginia law and resolved a number of factual questions that simply cannot be resolved on summary judgment. At bottom, pretty much every issue, we believe that there are fact disputes that prevent this case from being decided on summary judgment. Turning to the specific issues that I intend to address today, the first is whether the District Court erred by dismissing L-3's tortious interference and aiding and abetting tortious interference and conspiracy claims based on the holding that L-3 could not prove a business expectancy in those claims because L-3 was unable to prove an entitlement to the 37 task orders in question and that L-3 was precluded from bringing those tort claims due to the presence of a subcontract that did not guarantee L-3 any work. The second question will be, even if the subcontract did have some impact on the parties, which L-3 submits that it did not, whether L-3 was nevertheless the proper party in this case because it was a party to the subcontract, whether because L-3 services transferred all of its pre-2012 claims to L-3 ATI, the appellant in this case, because L-3 services transferred its entire hemp division to L-3 ATI as a matter of law, or whether CERCO knowingly did business with L-3 ATI and directly awarded it hemp work. And finally, whether L-3's tortious interference and COCA claims were filed within the applicable statute limitations. And to all those questions, we would respectfully submit the answer is yes. Okay. And do you agree that there is a distinction in the legal posture between your business conspiracy claim and your tortious interference claims? So, Your Honor, In other words, while CERCO may not be able to tortiously interfere with its own contract, it could certainly enter into conspiracy with a third party to do so. I'm sorry, Your Honor. So it seems to me that there is a distinction between these two aspects of your case, the one being the business conspiracy, the other being the tortious interference claims. And you've got to get, in order to prevail on your tortious interference, you've got to convince us that you can conspire, excuse me, that you can tortiously interfere with your own contract, can't you? Yes, Your Honor, but I think the case law here is very clear that you, under the Virginia Supreme Court, that you can, or I should say a defendant can, be held liable for tortiously interfering with its own contract, as long as it unites with a third party in doing so. So if every party to the contract, I'm sorry. So does that mean that the substantive tortious interference claims stand on their own, or you simply get to proceed on the conspiracy claim? It does mean that the substantive tortious interference claims stand on their own. And the reason is because a conspiracy is not an independent claim. I think the case law is clear that a conspiracy is just a means of imposing vicarious liability on multiple parties for the underlying tort. So, you know, the conspiracy statute, I'm sorry, the conspiracy claims. I mean, as a North Carolina lawyer, I know that's clearly the case in North Carolina. The cases say as much, but is there a case in Virginia that says directly that, that this is just a means to an end? Yes, Your Honor, it's the Dunlap case decided by the Virginia Supreme Court in 2014. I can cite you directly from that case. So, Your Honor, that case actually pulls together a number of authorities. And so what it holds here, it actually goes through it and says it a number of times. The Virginia common law claim of civil conspiracy generally requires proof that the underlying tort was committed. Conspiracy allegations do not set forth an independent cause of action. Instead, such allegations are sustainable only after an underlying tort has been committed. Since liability for civil conspiracy depends on the performance of some underlying tortious act, the conspiracy is not independently actionable. Rather, it is a means of establishing vicarious liability for the underlying tort. Okay. You've also got a statutory conspiracy claim. Is that any different? That is not any different, Your Honor. This case, Dunlap actually dealt with a statutory conspiracy claim. Okay. There's also an independent claim you can tune for aiding and abetting? Yes, Your Honor. Well, I think the important point of the aiding and abetting claim is the Virginia Supreme Court has not specifically decided whether it is an independent claim or it is. There's no authority for that proposition that there's a aiding and abetting claim in Virginia. Well, the Supreme Court in Halifax declined to answer the question. Right. So there's no authority to support that. You're asking us to project what the Virginia Supreme Court would in fact decide. Well, Your Honor, I would say that there is in fact authority to support it, and that goes back to the Ratcliffe case in 1915 for the last 100 years, which said that in any situation where someone joins with another party to do those acts, he is held liable for his acts of aiding and abetting as a joint tortfeasor. So I understand Your Honor's point, which is a good one, that whether or not there is an independent cause of action for aiding and abetting is slightly unclear. Well, then, and that was sort of my point. I was unclear about what your argument was. Yes, Your Honor. So I want to make the point then very clearly so that because actually when we pled this complaint, we recognized that this was an uncertain area of law. So what we did is in counts 1 through 34, we pled both the claims for tortious interference against Serco and also we pled in that count joint tortfeasor liability against Serco for its acts in aiding and abetting Jackson's tortious interference. And then in counts 35 through 68, we pled the separate aiding and abetting counts. So we would respectfully submit their Eastern District of Virginia cases that have held, the Alliance Tech case, for instance, that given this it is proper to go forward with separate aiding and abetting counts. But getting back to your tortious interference claim and your reliance on Dunlap, it seems to me that Dunlap, as I understand it, is making the distinction that the tortious interference with contract can provide the underlying basis for the conspiracy claim, but it doesn't say it's a stand-alone claim. And I refer you specifically to page 319 of the court's decision where the court says, we hold that tortious interference with contract and tortious interference with business expectancy each constitute the requisite unlawful act to proceed under a business conspiracy claim. They're not talking about a stand-alone claim there. They're not talking about a stand-alone claim specifically. Right, but you said Dunlap supported your proposition that it was a stand-alone claim. So do you have any other authority to tell us why it's a stand-alone claim? Because I don't think Dunlap makes that. I do, Your Honor. So respectfully, the point from Dunlap is that a conspiracy requires an underlying tort to establish liability. Right, you just cited it as the authority for your assertion that tortious interference claims stand alone. Yes, Your Honor. But I think the key case for the point Your Honor just raised is the Elliott v. Shorestop case from the Virginia Supreme Court. So that is a case where an employee sues an employer. So there is a contract in between the two, an employment contract in between. Alleging that the employee or specifically for tortious interference with a business or for tortious interference, alleging that the employer engaged with an independent third party to rig an examination against her so that she would fail it, thereby giving the employer an excuse to breach the contract. And the Virginia Supreme Court held in that case that because the employer united with an independent third party, that that case was allowed to proceed. And that was specifically tortious interference, not conspiracy. Well, the plaintiff called it tortious interference, but the court was discussing conspiracy, wasn't it? Well, I think that goes back to the point, Your Honor, which is that the underlying tort is sufficient as long as someone unites. I mean, another case is the Beattie case, which is an Eastern District of Virginia case, granted. But, I mean, that case was, again, within the conspiracy context. But what it said is before you can get to a conspiracy, you have to find an underlying tort. And so the first step we need to do is to look at the underlying tort and see whether that tort, tortious interference, is met. So ultimately, I guess, however you characterize this, you're going to have to prove that underlying tort. Exactly. Conspiracy claim. Exactly. And that also goes to our statute of limitations point because the district court, we believe correctly, held that each of the 37 task orders in this case accrued at the moment where that business expectancy in that task order was terminated, which is the moment that Serco awarded that task order to Jackson over L3. But then what the court did was for the conspiracy claims, held that those all accrued earlier. And we'd respectfully submit that what the court didn't think about in that case was that, again, there needs to be an underlying tort proven before a conspiracy claim can be actionable. So by necessity, those conspiracy claims could not become actionable until the underlying tort, tortious interference, was created. So they had to become actionable. The tort has to be proved in order to advance the conspiracy claim. But that doesn't mean that Serco could be held liable for the tortious interference, does it, necessarily? It seems to me you're suggesting that because you have to establish that as an element of your business conspiracy claim, that you then have the independent cause of action against Serco for that. Well, so, Your Honor, let me go to another case, which is the commercial business system versus Halifax case. And so I think that case makes Your Honor's point because in that case there was both a business conspiracy, but I think the Virginia Supreme Court was very specific that tortious interference claims against all parties were also tried. And so that's a case where they ended up finding that there was no business conspiracy, but only after trial and only after looking at, you know, a 2,700-page record to look for any credible evidence that the claims would have been, that there would have been a business conspiracy. Right, but the whole thing in that case was whether a jury could have, again, referring to page 267 of the court's decision, a jury could have found from the evidence that Waldrop and Halifax conspired to destroy. Again, it wasn't… Yes, Your Honor, but so that goes to my point because in that case the question was whether they conspired, but the counts that were brought forward, the counts that were tried to the jury, were specifically tortious interference counts. Conspiracy, too, but specifically tortious interference. So the Virginia Supreme Court had no problem letting the underlying tortious interference counts go to the jury because there was a conspiracy. But given that you do have to prove the underlying tort… Yes, Your Honor. …that's we're getting to advance the conspiracy claim, doesn't that go back to the question of whether you can assert a tortious interference claim against a party to the contract? Yes, Your Honor, I think it does, and I think the case law there is clear that you can as long as you unite with a third party in doing so. So, I mean, that's the Elliott case, that's the Bell South and Halifax cases. I mean, the Bell South case, I think, is really right on point. Yes, the Bell South, the tortious interference claim was only brought against the third party. It was not brought against the other party to the contract. So, respectfully… And that, not… Your Honor, respectfully, I would disagree. It was brought against the party to the contract. So, in that case, you had three parties. It was CBS, which was the plaintiff, and the plaintiff sued Bell South, and Bell South was the party awarding the contract. And then it also, or I might have that, or in any event, there were three, CBS sued two parties. We'll take a look at it. Yes, please do, because CBS sued two parties, one of whom was the contract administrator. He hired a man, the man who actually rigged the bidding was a guy named Waldrop, and Waldrop worked for the contract administrator. And so, because he was an employee, they sued the contract administrator. So, they absolutely did sue the party to the contract administrator. Okay, but the court's opinion talks about the contractual counterparty was only being sued on the business conspiracy claim, did it not? I don't remember that specific language, but if you go to Halifax, where it explains this… We'll take a look. Yes, Your Honor. You can only sue that third party. Your Honor, my time has expired. Oh, you can answer my question. So, no, you can sue. It doesn't matter. The cases are clear that it doesn't matter whether you sue the party to the contract or the third party or both, as long as they actually conspire together. It doesn't matter who the defendant is. So, in the Elliott case, they sued the employer, which was the party to the contract. In the CBS case, especially in Halifax, because in Halifax, two different cases were consolidated for trial. But so, in Halifax, they sued both the party to the contract, the contract administrator, and the third party. But it doesn't matter. All that matters is that, as a factual pattern, they unite together, and an independent third party is involved. If an independent third party is involved, then you can sue the third party. And when you come back on rebuttal, if you take a look at the bottom of 893, carried over to 894, where it talks about the issues submitted to the jury, where CBS claims against all defendants of statutory conspiracy, common law conspiracy, and conspiracy to torturously interfere. Also submitted was CBS's claim against Halifax and McGuire of wrongful interference with a prospective business relationship. I will, Your Honor. Okay, thanks. Thank you. Mr. Wilburn? Yes, Your Honor. May it please the Court, my name is John Wilburn. I'm with McGuire Woods and represent CERTA, the appellee, in this matter. In the interest of time, I'll try and address some of the issues that the panel raised with the appellant's counsel. Judge Ellis, we believe, correctly entered summary judgment against L3 in this matter for a variety of reasons, any of which are substantial grounds to affirm his decision. But in looking at the causes of action, picking up the questions that the Court had a moment ago, the first 34 causes of action simply don't exist under Virginia law. The Court pointed the parties recently to the Francis Hospitality decision, which was decided in November of 2018. And there, the Court very clearly stated that parties to either a contract or a business expectancy may not be liable for tortuous interference with that contract. Only a party outside the contractual relationship. That's correct. The claim only lies only against parties outside the contractual relationship, strangers to the contract, or business expectancy. And so counts 1 to 34 fail. And that's the most recent pronouncement of the Court on this issue, although it's not a new statement of the law. With respect to the cases that counsel cited to, Elliott Shorestop, Dunlap, and Commercial Business Systems versus Halifax, there's a substantial difference between that and this fact pattern. In those cases, there were at least three parties to the claims. And so what you had to support the conspiracy claim is an underlying independently actionable tort. So in those cases, the plaintiff sued the third party interferer under whatever viable claim, interference with contract. I think those were all contract cases. And then on top of it, a conspiracy claim could be stacked. Here, counts 1 to 34 don't exist as a matter of law, and so counts 69 and 70 can't be supported, the conspiracy claims. The same analysis applies with counts 35 to 68, which is aiding and abetting tortious interference. The Virginia Supreme Court's never recognized that cause of action. The cases that the appellant cites, there are four cases. Three of those cases are unpublished federal court decisions where the district court discussed the fact that Virginia may recognize aiding and abetting breach of fiduciary duty. When you say counts 134 are not viable, is that because they were pled against Serco and not Jackson? That's correct. So what if they pled it against Jackson, recognizing that there's been ample litigation against that party elsewhere, but what's the result? That's true. If they had filed, if L3 had filed a claim against Jackson for tortious interference with business expectancy, which they haven't, that theoretically could be the predicate tort on which a conspiracy claim could be built. But they didn't bring that, and it's not enough. Counsel argues that it's enough to simply allege facts. Isn't it enough to prove the tort, though? It's not. Even though you can't recover against Serco because on the theory they can't be tortiously interfered with their own contract, why can't you prove the underlying tort, even though they can't be held liable, in order to establish your conspiracy claim against them? Correct. You can't. The Supreme Court has said you can't. In Francis' hospitality, in addition to finding that the direct cause of action for interference with contract or expectancy didn't exist, having found that at the last page of the opinion, they said because that cause of action did not exist, the conspiracy claim stacked on top of it could not lie. But I think the issue is even more directly stated by the Virginia Supreme Court in the LaValladanna decision, which was 2017, and there this was the issue, is whether it's enough, as the plaintiff contends in this case, to allege facts that, if true, would establish liability against a non-party. And there the court said that an action for civil conspiracy will not lie unless the predicate unlawful act independently imposes liability upon the primary wrongdoer. You have to be able to establish liability against the primary wrongdoer. In this case, theoretically, it would be Jackson on a tortious interference with contract claim. That same holding was repeated in Gelder v. Glock, where the court entered summary judgment and found that the conspiracy claim, although the allegations in the complaint, if true, would constitute a conspiracy between the defendant and other parties identified in the complaint but not named as defendants, the court said the failure to have more than the single defendant rendered the conspiracy claim untenable. And it said civil conspiracy cannot be maintained in a suit involving a single defendant where the underlying torts are also asserted by separate counts against the same defendant. What if L3 had simply alleged a conspiracy claim against, which they did actually, against Jackson and your client, and simply not pled the substantive tortious interference claims? Are you saying that that conspiracy claim would not lie against your client? It would not lie because the holding in the hospitality case and also the holding I just cited in La Bella Donna, where the Supreme Court said that you have to not just allege, but you have to independently prove and impose liability on the primary wrongdoer. And it's impossible to do that in this case because when you look at the underlying cause of actions, Counts 1 to 34, we believe, do not exist. It's a direct interference claim. Well, who's the primary wrongdoer? It seems to me you're assuming that Circo is. I mean that Jackson is. But we have to look at. That Circo is, excuse me. Oh, I understand. But we have to look at what claims are pleaded. Right. Who's the primary wrongdoer? You could answer that. Yes. In Counts 1 through 34, we're alleged to be the primary wrongdoer. We're alleged to have interfered with our own business expectancy. In Counts 35 to 68, the allegation is that we aided and abetted Jackson to interfere with the expectancy. So the aiding and abetting, which does not exist, is a claim built on top, a derivative claim built on top of an allegation that Jackson interfered. So. Well, they're arguing that Circo interfered by diverting business to Jackson. So you're the primary tortfeasor because you interfered with the business expectancy by diverting claims that L3 was entitled to receive, had every reason to believe it would receive because of its particular expertise in this area, and diverted it to the third party, the non-party to the contract. Correct. Either way, either way you can screw it. And I think that's pleaded differently for 1 to 34 than 35 to 68. But either way, the law is clear that Circo can't be liable for tortiously interfering with its own business expectancy or contract. That's clearly the law as expressed in the 2018 decision and all the cases. But you're not interfering with your business expectancy. You're interfering with L3's business expectancy by utilizing Jackson. I probably. How they characterize it. I was imprecise in my language. What Francis Hospitality said is that a party may not be liable for tortiously interfering with a contract or expectancy to which they're a party. Right. And so. But I think it goes back to perhaps Judge Kenan's question. Can it not establish, you may not be liable, but can it establish the tort? It cannot. It cannot because it doesn't exist as a tort. Circo, it's legally impossible for us to be liable for tortiously interfering with a contract or expectancy to which we're a party. And the complaint, assuming that the proper parties are before the court, and we contend they're not, assuming that the proper parties are before the court, the expectancy is to obtain task orders from Circo. So Circo is a party to the expectancy that's at issue. And under the Francis Hospitality case and the 30 years of cases prior to that, no tort exists for allegedly interfering with that expectancy. And so. Let me ask you about the expectancy. One concern I had with Judge Ellis' opinion was the fact that he talks about the subcontract governing the relationship of the parties. And he relies on the government contracts expert, Ms. Konosky, who testified. So my question to you is, can't there be a business expectancy independent of the subcontracts terms, which no question warned against any right of business under the task order? And I know that every task order had the same disclaimer. But can't there have been a business expectancy independent of that subcontract and task order language? Correct. I think the answer, particularly under this record, is no. I think if we're to expand it sort of theoretically, if there's an agreement between two parties, it's impossible to have some other expectation outside of it. It's probably not impossible. But looking at the record that was before Judge Ellis in this court, there's no evidence of that. And there's really three buckets. Okay, but why is it not possible based on the course of dealing between the parties and the fact that L3 does appear to possess, if not, unique expertise in this area that they claim was pirated by Jackson? So based on the course of business dealings over some extensive period of time, why wouldn't that give rise to a reasonable business? Why could not that give a predicate for a reasonable business expectancy? I think for two reasons. One, because the parties entered into, when you look at the subcontract and then ultimately. But you can modify a contract by dealing if both parties agree. Can you not by course of conduct? You can modify terms under certain circumstances. There's a non-waiver provision. But you don't modify parties. And I think what's important to this analysis is the parties that chose to sue, the parties that chose to, one of the two didn't exist until years after the claims allegedly accrued. L3 ATI was not formed. It wasn't incorporated until November of 2011. The complaint and the record shows that L3 contends that this conspiracy ensued in 2007. And it continued in 2008 and 9 and 10. And so the notion, when you look at the complaint and the allegations in the complaint, is that they have a business expectancy based on their long history as the incumbent going all the way back to 2004. L3 ATI did not exist. But L3 ATI is the successor to L3, is it not? They are the successor of certain assets. They are not the successor interest to these causes of action. And that's an important distinction. Can you explain that for us, why they're not? Yes. An inquiry to which New York law applies, is that correct? I'm sorry? An inquiry to which New York law applies? Yes, yes. And I think L3 acknowledges this in part in their brief. The cause of actions accrued sometime in 2007, no later than 2008. L3 ATI did not exist until November of 2011. L3 ATI claims its standing or its expectancy by virtue of what's called a contribution agreement, which is in the record. The contribution agreement purports to assign from L3 Services, Inc., who is the contracting party, to L3 ATI all the right title and interest in the business. That's what it says. That agreement by its terms is governed by New York law. New York law is clear that assignments of torts cannot be assigned by a general assignment. There's got to be something within the four corners of the document that evidences an intent to convey those tort claims. And we've cited the two cases on this issue, Bank A Arrabe and the Optimal Bank decision. And there's nothing about that contribution agreement that references torts. But as I recall, Bank Arrabe, the court determined that the assignment provision had transferred the tort claims because the provision referred to the specific transaction giving rise to the claim. Is that correct? That's correct. And here what you have is a reference. The contribution assignment assigned rights, title, and interest legal and equitable to in and to all of the assets. And assets are defined by reference to the Applied Technologies Division. So why wouldn't it be brought in through that reference in the contribution agreement? Because I think that interpretation would swallow the rule. The Bank A Arrabe case identified, it said that while a general assignment of assets is inadequate, in that particular assignment document there was a reference to the specific transaction at issue. When you look at the contribution agreement, all it is is a general assignment of assets. The assignment of all assets from L3 services to L3 ATI. There's no reference in there, as there was in the Arrabe decision, of the transaction at issue, meaning the C4 subcontract, the task orders, the... Are there so many then here that it would be inspecific? So many assets? Well, it's the assets of an entire entity. And that, the way that... Which exists primarily service circle, as I read the facts perhaps incorrectly. No, I don't know. I don't know that there's a citation in the record to that. I'm not sure that's the case. I was just trying to understand on these facts why that language was so impermissibly broad here. Here, it's impermissibly broad because it's a general assignment. And general assignments are prohibited under New York law to effectuate a transfer of torts. And the exception that the poor found in the Arrabe decision was where there was a reference to a specific transaction. Not a specific... I mean, here it's the entire company. So what does that do to your defense? Walk us through that. Well, it... What's the consequence in this case? It goes to the expectation issue. It's the same issue that was raised initially by us in the 12B1 and then remanded back to the district court for a decision on either 12B6 or summary judgment, whether these parties had an expectation at all in these documents. And the contract was with L3 Services, Inc. That was the 2004 subcontract. And when you look at the record, there's no question that throughout this record, the allegation is that L3, and they use the term collectively, but that their expectation came from the subcontract. So you're saying that L3 ATI cannot rely on any prior course of dealing of L3? Because they weren't assigned the tort claim under New York law. Is that your case under that? It is, but I think that's not even the case they're making. L3 is arguing that they haven't... No, I'm asking you what argument you're making. Yeah, I would agree that there cannot be a course of dealing between a service or an entity that did not exist. And the course of dealing argument that is asserted in the papers is that beginning in 2012, it's an alternative argument. So the first argument by L3 is that there was an assignment of the torts. The alternative argument is that there was an assignment by operation of law and or by course of dealing. And what I think the district court correctly found is they rejected the operation of law because the two cases cited by the appellant were inapplicable. One is the Franz Werth decision, and it's just simply misstated in terms of the whole thing. I can talk about that. The other is they relied on the Federal Anti-Assignment Act, which doesn't apply because one, it's not a federal contract, and two, it only deals with partial assignment of torts. But I do think that decision, this is the L3 communications case against the government, it's very instructive because when you look at it, it discusses an assignment of claims. And in that document, it's in the opinion, there's a section that talks about a general assignment of assets in the same way you see in the contribution agreement. There is a separate and independent paragraph in which L3 was the assignee of all torts, chosen actions, causes of action, forms of relief. So in the case they rely upon, it's clear that L3 understood how to assign torts and causes of action, and that language is quoted by the court and relied upon by the court. In terms of the, I'm sorry to be so long getting to this point, on the course of dealing, the last argument that's made is that beginning in 2012, L3 ATI developed their own course of dealing, that they had their own relationship with us. That fails for two reasons. One, the documents, the record that they cite to, well three reasons, let me back up. One, it's a constructive amendment of the pleading. And what I think Judge Ellis correctly recognized is that that's not pleaded anywhere in the complaint or the First Amendment complaint. There's not a single allegation in there that says L3 developed its own independent relationship beginning in 2012. Second, the documents on which they rely don't support that. There's a collection of a handful of documents, and I brought those, but they're in the record. And the argument is that ATI's name appears on those. When you look at them, the documents that relate to RFPs actually say, in the subject line, L3 Services, Inc. And it will say that the caption is L3 Services, Inc. slash, it will have ATI slash JCORP. But there's nothing about those documents that evidences an intent by CERP, though, to contract with anyone other than the parties with whom they've been contracting for years. Okay. To what extent does our analysis of this case depend on the fact that this is a government contract and whether you can have an objective business expectancy in a contract that is governed by a task order that says you may or may not get anything, we may or may not award any work, and the subcontract itself says the same thing? How does that factor into our analysis? I think it's one of several grounds on which the court could affirm. I mean, as I mentioned at the outset, I think the causes of action do not exist for 1 to 68, and as a result, 69 and 70 cannot lie. That's one ground. Statute of limitations is another. Improper party is a third. But the other ground that you reference is one that Judge Ellis relied upon, and that's that even if they're a party to the contract, when you look at the contractual documents, and there's three, the subcontract, the RFP, and the task order, they all interrelate to each other, and they all say essentially the same thing, that task orders will only issue pursuant to the terms and conditions of the subcontract. There will be no work or relationship outside of the subcontract. So that goes to this notion of whether you can have an expectation or a duty outside of the subcontract. Okay. Can somebody in a government contracting situation ever establish a reasonable business expectancy? Outside of the contract? Yeah, under this kind of language. Take it outside this case, but use the shell language of both the RFP and the subcontract. Could you ever establish a business expectancy in a government contract? I don't know. I mean, I would never say never in a hypothetical like that. I would say not under the record that's before the court, and that's the challenge. What is the rationale then behind your answer? Are you saying because, what, that congressional funding is uncertain, so we don't know if CERCO is going to get the money, and so you can never have the expectation? Oh, no, I apologize. I think I misunderstood. The rationale is several fold. One, the nature of the contract itself is an IDIQ, and so it's indefinite delivery, indefinite quality. And so as L3 acknowledges, there may never be any work under that. And, of course, you have the limiting language in the document itself, which says there's no guarantee, and you may not get any contracts, and we can award them even if they're in our best interest. But I think the broader point for us on that issue is that there can't be any expectation outside of these documents because there's no record evidence to show that there were any task orders that were awarded outside of the subcontract and RFP process. Every task order has the language that says it's governed by the subcontract. And so for L3 to argue to the district court without any citation to evidence that our expectation had nothing to do with the subcontract or the language of the task order or the RFP, it's just because we are the preeminent provider of this service, and we should be able to proceed on a theory of tort rather than contract. These are two commercial entities that developed a, signed a complex and integrated document, and at the end of that relationship, chose, they've chosen to sue in tort when their relationship is governed by contract. I think I've exhausted my time. Thank you very much. Thank you very much. Mr. Dreen? Yes, Your Honor, if I might just have one second. Mr. Dreen, on the issue of this reasonable business expectancy, I think that's a, you know, really a central issue in the case that Mr. Wilburn has identified here that we've got to grapple with. Can you have an objective expectancy when you have not only the language of the contract and the language of every task order, specifically disclaiming there may be no work, there may be work, who knows? Yes, Your Honor. Can you have, all these cases you're citing are not government contracts, are they? I mean, is this something that changes, you know, the lens that we've got to look at this problem through? So, Your Honor. And I don't know the answer to it, so you tell me. Yes, Your Honor. I have a couple different answers. The first and most important is obviously, yes, there can be a business expectancy here. The first reason is because of what the subcontract says. So, even assuming the subcontract applies, the subcontract says there's no guarantee of work. There's no entitlement to work. But the standard for a business expectancy claim is whether there's a reasonable probability of work. Okay. What do you have in this case as an objective evidence of expectancy? You've told us subjective. We've gotten them all in the past, so we think we should get them in the future. But where is the objective evidence of expectancy here? So, Your Honor, I think the distinction between subjective and objective is not necessarily what we should look at. What we should look at is it's just a factual question. Well, it's an objective determination, though, under the case law, is it not? I think it's actually just a factual question. The question is, would a jury have the ability to find that the plaintiff would have probably gotten the contract, I think what the question is going to is, what are you giving us to rely on that suggests that those would be the forthcoming facts? So, what I'm giving you, Your Honor, is course of dealing, history, the fact that L3 is the preeminent provider of hemp services. So, if another provider comes into, another entity develops this area of expertise, your business expectancy claim disappears? That's not actually true. No, that was a question. No, no, no, I'm sorry, I was answering that. I don't believe that that's true. And the great case to look at here is the Gil Ramirez case out of the Fifth Circuit. That might not be a government contracting case. Well, that's kind of the lens, I think, in which our questions are being focused now. Because part of L3's, the thrust of L3's argument is that they have a unique expertise on which Serco came to rely. Yes, Your Honor. Because it had nowhere else to go. That's implicit in the business expectancy claim. That's what makes our case so strong on business expectancy. In Gil Ramirez, it was 42 out of 64 contracts awarded. So, in that case, other people could do the work and even did the work. It wasn't a government contract. It wasn't a government contract. It was a contract award case. Right. So, given the facts here, what are you giving us on which to rely apart from the strength of your status? So, Serco itself, in a 2008 task order, said that L3 was the only one that could do this work, that L3 was the only one that had the ability to do all of the facets, and that it would be cost prohibitive for anyone else to do the work. The actual Air Force contractor who ran this program, when asked at deposition, said that he didn't even know of anyone else who could do the work. Okay, and so that raises another question then. If L3 was getting all the work because it was the only people out there who could do it, then you get Jackson on the scene, and Jackson can clearly do the work too. How do they have a reasonable expectation of future business based on their prior course of dealing when now there's a competitor? And there is no obligation to award work under the language of the task order to anybody. It seems to me that their dominance of the field doesn't support their case once there's another competitor. That's a very good question, Your Honor. And the answer is because you have to look at the field but for the misconduct. So if Jackson were a proper competitor into the field. But you have to look at the field to establish the misconduct. Part of the problem is you have to begin the analysis somewhere. And if your argument is that L3 is so strong that no one in 2008 could compete, it raises the question that Judge Keenan poses. That's no longer the existence, the presence of a new entrant would seem to fairly significantly affect the inquiry. Well, so I have two responses to that, Your Honor. And you have to assume the existence of misconduct, but that sort of assumes the answer to the initial inquiry. Well, so I guess I now have three responses, Your Honor. One is because it's a summary judgment, the facts have to be in the light most favorable to L3. So you do have to assume the misconduct. Well, yes, but there's still a competitor. Well, but there would not have been a competitor, Your Honor. You're saying they wouldn't have existed? They would not have been able to enter the market. They did not have the funding. They did not have the expertise. They did not have the security clearances. Is this in your pleadings? Yes, it is, Your Honor. Okay, whereabouts? It's in our pleadings. I'm sorry, I don't have the actual paragraphs of the complaint in front of me. Okay. But it is within our pleading, within the opening paragraphs explaining the facts. We pled that through Serco's intentional inference, Serco gave them milestone payments, improper milestone payments that gave them the funding necessary to build the equipment. Jackson misappropriated L3's trade secrets and proprietary information, which gave them the ability to bid and to do the work, which they couldn't have done otherwise. Serco gave Jackson independent and inside information to allow them to bid. So Serco did all these things to prop those. Serco did not make Jackson fulfill a financial responsibility form, which would have precluded them from bidding. It allowed them to use their security clearances. So without all of these things, Jackson would never have been able to enter the market. And so L3 would have been still the sole provider. But the other point, Your Honor, I think that's really important here, that's kind of the crux of all this, is that thinking of it that way requires an elevated standard. Because a business expectancy does not mean an entitlement to work. It doesn't mean a guarantee. It only means a reasonable probability. Right. But we've got to be careful, though, in this government contract context, don't we? See, what I'm worried about is that you've been arguing this case really as a commercial systems versus South or, you know, any kind of Virginia Supreme Court case where you didn't have a government contract structure. And you're asking us to kind of march out in the context of this government contract and just apply the Virginia law, which has never dealt with government contracts. And I'm nervous about it. And I don't think you've given us an answer why the Virginia law is a clear template that answers definitively the government contract situation. So, Your Honor, I have two responses. One I think is, as Your Honor mentioned, if this isn't the law, there could never be a tortious interference case in a government contract situation. Even in a commercial context, there's no guarantee of work outside of a contract, right? Exactly, Your Honor. I mean, this clause is really an unremarkable clause. It really doesn't do anything but state the obvious, that you don't guarantee any work. That's not what a business expectancy is based on. And I'd also point out, Your Honor, that one, the National Railroad case, I believe, was a government contract case with Amtrak, although there's a chance it was private. I can't guarantee that. But more importantly, you know, the Supreme Court, the U.S. Supreme Court this time, has said in the Kingdomware case that a task order is the contract and that the subcontract is not a contract because it doesn't guarantee any work. As Mr. Wilburn said, no work may ever be awarded. So what that means is it's not a real contract. It doesn't have material terms. Okay. How do you answer L-3, L-3 ATI's argument that there was no, you can't base your expectation based on the prior company? Your Honor, I see my time is up. Yeah. Go ahead and answer that. Thank you. So I think, Your Honor, hit the nail right on the head. L-3 ATI is the successor to L-3 Services. I mean, the rest of this. Okay. But they're saying, why is New York law, why doesn't that create an obstacle for you? It not only doesn't create an obstacle, but it helps us. So two cases under New York law that we cited in our briefs, both looked at the exact same language we have here, transfer all assets. And it said that the all assets language is, as Your Honor said, like the Bank Arabe language of transaction, and it's broad enough to encompass all tort claims that are transferred. So Mr. Wilburn said that it's too broad, but it's actually the opposite. What the cases look for is they look to see whether the language is broad, and if the language is broad, then it includes a transfer of everything, including causes of action. And if it's narrow, like the agreement in Bank Arabe, then it sticks to just the agreement. So the fact that this is too broad actually helps us. It shows that this is a transaction that definitely, that obviously covers the tort claims in this case. And three different, they're not alternate arguments, as Mr. Wilburn said. They're three different ways in which we can show that L-3 ATI is the successor, any of which are sufficient here. One is the transfer of the tort claims. Two is the operation of law, which is really straightforward here, I would actually submit. Because L-3 Services gave its entire hemp business to L-3 ATI. It's a normal transfer of operation of law by a corporate reorganization, and L-3 Services doesn't exist anymore. I mean, this is the quintessential case of a corporate reorganization transferring its interest to a new successor, and that successor is allowed to take over everything, including the business expectancy, including the course of dealing, including the subcontract. Okay, I think you've answered the question. Thank you, Your Honor. Thank you very much. Thank you. We will come down and greet counsel and proceed directly to the next case.
judges: Allyson K. Duncan, Barbara Milano Keenan, Albert Diaz